**Abdeen M. JABARA, Plaintiff-Appellee,**

v.

**William H. WEBSTER, et al., Defendants-Appellants.**

**No. 80–1391.**

United States Court of Appeals, Sixth Circuit.

Argued March 11, 1982.

Decided Oct. 21, 1982.

Rehearing and Rehearing En Banc Denied Dec. 17, 1982.

Benjamin Civiletti, Atty. Gen., Alice Daniel, Acting Asst. Atty. Gen., R. John Seibert (argued), Civil Div., Dept. of Justice, Washington, D. C., James K. Robinson, U. S. Atty., Detroit, Mich., for defendants-appellants.

John Shattuck (argued), American Civil Liberties Union, Washington, D. C., for plaintiff-appellee.

Before MARTIN, Circuit Judge, and PECK and BROWN,* Senior Circuit Judges.

BAILEY BROWN, Senior Circuit Judge.

Appellee, Abdeen M. Jabara (Jabara), a Detroit lawyer of Arab extraction, has over the years been interested and active in Arab causes. The Federal Bureau of Investigation (FBI), as a result of his activities, began an investigation of him in 1967. This investigation was not continuous and varied from time to time as to intensity and as to the technique used. The technique used by the FBI included physical surveillance by agents and informants, including his speech-making activities, inspection of Jabara's bank records, warrantless electronic surveillance by the National Security Agency (NSA), and interviews of third parties regarding Jabara. This information was maintained and disseminated by the FBI.

---

\* Circuit Judge Brown retired from regular active service under the provisions of 28 U.S.C. § 371(b) on June 16, 1982, and became a Senior Circuit Judge.

Jabara filed an action in district court in Detroit in October, 1972, alleging several causes of action. The defendants include the Attorney General, the Directors of the FBI and NSA in their official capacities and certain known and unknown officers and employees of the FBI and the NSA. One cause of action alleged was that Jabara's fourth amendment rights were violated as a result of NSA's interception of his "communications by means of warrantless electronic surveillance and/or disclosed summaries of these interceptions to the Federal Bureau of Investigation."[1] Another cause of action alleged was that the defendants violated a provision of the Privacy Act, 5 U.S.C. § 552a(e)(7), by maintaining records with respect to Jabara's exercise of his first amendment rights. The district judge, on cross-motions for summary judgment, granted judgment and injunctive relief to Jabara as to both of these claims and defendants appealed.[2]

I.

■ A preliminary question presented on this appeal is whether this court can, as contended by defendants, properly consider in camera the classified appendix that defendants filed in the district court.[3] Jabara's position is that this court should not consider the materials in the classified appendix at all unless the materials are made available to him or at least to his counsel subject to a protective order. The district court determined (75 F.R.D. 475, 487 (1977)) that these materials, because they are properly protected by the state secret privilege, should be submitted in camera; this was done without access by Jabara or his counsel. We conclude that the district court was correct in its ruling and, further, that this court likewise may properly receive in

camera and so consider such materials in the classified appendix. United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); Kerr v. United States District Court for the Northern District of California, 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976); and Halkin v. Helms, 598 F.2d 1 (D.C.Cir.1978).

II.

To understand the fourth amendment issue raised by the NSA's interception of Jabara's communications and supplying these to the FBI, all without a warrant, it is necessary briefly to describe the factual background of this claim and then to outline the contentions of the parties.

The NSA intelligence gathering operation is described sufficiently for present purposes in Halkin, 598 F.2d at 4, as follows (footnote omitted):[4]

A brief description of NSA and its functions is appropriate. NSA itself has no need for intelligence information; rather, it is a service organization which produces intelligence in response to the requirements of the Director of Central Intelligence. Intelligence Activities: Hearings Before the Select Comm. to Study Governmental Operations with Respect to Intelligence Activities of the U. S. Senate, 94th Cong., 1st Sess. Vol. V at 9 (1975) (Hearings). The mission of the NSA is to obtain intelligence from foreign electrical communications. Signals are acquired by many techniques. The process sweeps up enormous numbers of communications, not all of which can be reviewed by intelligence analysts. Using "watch-lists"—lists of words and phrases designed to identify communications of intelligence interest—NSA computers

1. Second amended complaint. (App. at 69).

2. The history of this litigation, including citations to reported opinions dealing with resolution of discovery issues, is clearly and fully set out in the opinion of the district court resulting in the grant of summary judgment and injunctive relief. Jabara v. Kelley, 476 F.Supp. 561 (E.D.Mich.1979).

3. In camera treatment and the assertion of the state secret privilege were supported by the in camera affidavits of Secretaries of Defense Schlesinger, Rumsfield and Brown.

4. See also: Note, Government Monitoring of International Electronics Communications: National Security Agency Watch List Surveillance and the Fourth Amendment, 51 S.Cal.L.Rev. 429, 431 (1978).

scan the mass of acquired communications to select those which may be of specific foreign intelligence interest. Only those likely to be of interest are printed out for further analysis, the remainder being discarded without reading or review. Intelligence analysts review each of the communications selected. The foreign intelligence derived from these signals is reported to the various agencies that have requested it (Hearings at 6). Only foreign communications are acquired, that is, communications having at least one foreign terminal (Hearings at 9).

On November 1, 1971, the FBI, without a warrant, requested the NSA to supply it with the contents of Jabara's telegraphic communications sent overseas, and the NSA complied by furnishing the FBI with summaries of six of such communications.

Defendants contend that the fourth amendment does not apply to and limit NSA's gathering of foreign intelligence. They also contend that, in any event, the facts surrounding the acquisition by the NSA of overseas telegraphic communications such as those sent by Jabara are subject to the state secret privilege.[5]

Jabara, however, does not even contend on this appeal that the interception by the NSA violated his fourth amendment rights; we may therefore take as a given that the information was legally in the hands of the NSA. What Jabara does contend, and the district court agreed, is that his rights were violated when the NSA turned over the information, without a warrant, to the FBI. Defendants, on the other hand, contend that, since the NSA had lawfully intercepted and had made a record of the content of Jabara's communications, the fourth

amendment was not implicated when the FBI requested and obtained the summaries from the NSA. This is so, defendants contend, because there simply was no "search" or "seizure" when this information was turned over to another agency of the government.

Defendants still further contend that, even if there was a "search" or "seizure" when the FBI obtained the summaries from the NSA, a warrant was not required because there is a "foreign agent" exception to the warrant requirement and the foreign agent exception was applicable here since, at the time the FBI made the request for the summaries, it had reasonable cause to believe that Jabara was in fact a foreign agent. Jabara, on the other hand, contends that there is no foreign agent exception to the warrant requirement and that, in any event, at the time the FBI made the request, it had no reasonable cause to believe that he was a foreign agent.

In connection with defendants' contention that the FBI had reasonable cause to believe that Jabara was a foreign agent when it requested the summaries, there is a threshold procedural issue. After the district court had made its decision that Jabara's fourth amendment rights were violated when the summaries were supplied to the FBI (476 F.Supp. 561 (1979)), defendants moved for reconsideration and filed additional open and *in camera* affidavits[6] to support their contention that, at the time the FBI made the request for the summaries, it had reasonable cause to believe that Jabara was a foreign agent. The defendants argued, in support of their motion to reconsider, that they had been surprised by the court's decision that the FBI's acquisition of the summaries was a fourth amend-

---

**5.** This was so held in *Halkin, supra;* indeed in *Halkin,* it was held that, pursuant to the state secret privilege, the government did not even have to divulge to plaintiffs whether the NSA had intercepted their overseas communications. Here, as previously indicated, the government has divulged in the open record that NSA did intercept and later turn over to the FBI Jabara's communications.

**6.** These affidavits were executed by Special Agent French of the FBI, who is in the Records Management Division in Washington. Defendants contend that these affidavits, particularly the *in camera* one, demonstrate that on the day the FBI requested the summaries of Jabara's overseas communications from NSA, November 1, 1971, it had received solid information from the Central Intelligence Agency that Jabara was, indeed, a cadre member of a Middle East terrorist organization.

ment violation since they had thought that the controlling issue was the legality of the NSA's interception of the overseas telegraphic communications. Defendants further argued that, since the NSA's interception of the overseas telegraphic communications in performance of its foreign intelligence function did not invade Jabara's fourth amendment rights whether or not Jabara was a foreign agent, they had no reason to emphasize the FBI's reasonable belief that he was. The district court, in its unreported memorandum denying the motion to reconsider (App. at 190), determined that the question whether there was cause to believe Jabara was a foreign agent had been an issue in the case and that it had theretofore determined (75 F.R.D. at 493) that, in the record then before it, there was no evidence that Jabara was connected with or was a foreign agent.[7] The district court further determined that the additional affidavits executed by FBI agent French and filed in support of the motion to reconsider (as proof of a reasonable belief that Jabara was a foreign agent) contained no information that had not been available to defendants throughout the litigation. The district court denied the motion to reconsider because the foreign agent status of Jabara had been in issue and because the information in the additional affidavits had been available to defendants prior to the grant of summary judgment. Defendants contend on appeal that the district court did not even consider, as they contend it should have, the additional *in camera* affidavit of Agent French in making its decision to deny the defendants' motion to reconsider the grant of summary judgment, while Jabara contends that the district court did consider it. It appears to us that the district court only determined that the information contained in these French affidavits had been available all along and did not weigh and determine whether the *in camera* affidavit demonstrated that there was

reasonable cause to believe that Jabara was a foreign agent. Since, however, we determine herein that Jabara's fourth amendment rights were not violated when the summaries of his overseas telegraphic messages were furnished to the FBI irrespective of whether there was reasonable cause to believe that he was a foreign agent and whether there is a foreign agent exception to the warrant requirement, we need not consider the question whether the district court abused its discretion in not weighing the contents of the *in camera* French affidavit and whether the affidavit established such reasonable cause.

The district court, in determining that Jabara's fourth amendment rights were violated when the FBI, without a warrant, obtained the summaries of his overseas telegraphic communications, distinguished the holding of the District of Columbia Circuit in *Halkin v. Helms,* 598 F.2d 1 (1978). There the court held (see note 5 herein at page 275) that application of the state secret privilege required dismissal of plaintiffs' claims based on alleged interception by the NSA of their overseas communications because the fact of interception need not be and was not divulged. Here, on the other hand, defendants had divulged the interception and later transmittal to the FBI.[8] Thus, the district court reasoned, the state secret privilege was no impediment to the adjudication of Jabara's fourth amendment claim. The district court went on to hold, citing *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that the fourth amendment was implicated since Jabara had a reasonable expectation of privacy with respect to his overseas telegraphic communications. The district court further held that, since the record, classified or otherwise, did not reveal evidence that Jabara was a foreign agent or was acting in collaboration with a foreign agent, even if

7. We agree that, as the record stood at the time the district court granted summary judgment to Jabara, it did not support reasonable cause to believe that Jabara was a foreign agent when the FBI requested the summaries from the NSA.

8. As pointed out in *Halkin,* 598 F.2d at 9, it is not altogether clear why this disclosure was made by the defendants in the instant case.

there is a foreign agent exception to the warrant requirement, the exception could not be applied here. The district court therefore granted summary judgment and injunctive relief to Jabara. 476 F.Supp. at 577–579.

As heretofore stated, Jabara does not contend on appeal that the NSA's interception of his foreign telegraphic communications violated his fourth amendment rights, and therefore we may take as a given the proposition that the NSA lawfully received and was in possession of the communications. From this proposition defendants argue, we think correctly, that Jabara's fourth amendment rights were not violated when the summaries were turned over to the FBI because this was not a "search" or "seizure" within the meaning of the amendment. This is a clear implication of such decisions as *United States v. Gargotto,* 476 F.2d 1009 (6th Cir. 1973), *cert. denied,* 421 U.S. 987, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975). There an arson investigator gathered some papers from the floor of the burned building as evidence of the cause of the fire. These papers were later turned over to federal agents when they appeared to be gambling records. The court held that the papers were lawfully in the possession of the arson investigator under the "plain view" exception. It further held that the federal agents lawfully obtained possession from the arson investigator, stating (476 F.2d at 1014):

> Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken. *Gullett v. United States,* 387 F.2d 307 (8th Cir. 1967), *cert. denied,* 390 U.S. 1044, 88 S.Ct. 1645, 20 L.Ed.2d 307 (1968).

The holding by our court in *Gargotto* was followed by our court in *United States v. Lewis,* 504 F.2d 92, 104 (6th Cir. 1974), *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975).

Jabara contends, however, that there was a "search" or "seizure" when the summaries were turned over by the NSA to the FBI under the holding in *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). There some pornographic 8-millimeter films, in boxes that were in sealed packages, were misdelivered after shipment, and the recipient opened the packages. On the boxes were descriptions and drawings that clearly indicated their contents. The recipient, however, did not view the films but turned them over to an FBI agent. FBI agents, then, without a warrant, viewed the films with a projector. The question before the Court was whether the films should have been suppressed because the showing of the films with a projector was an illegal search under the fourth amendment.

In a five-to-four decision, the Court held that the showing of the film with a projector was a "search" and therefore the showing violated the fourth amendment. Justice Stevens authored the lead opinion for the majority, saying (447 U.S. at 654, 100 S.Ct. at 2400):

> [N]otwithstanding that the nature of the contents of these films was indicated by descriptive material on their individual containers, we are nevertheless persuaded that the unauthorized exhibition of the films constituted an unreasonable invasion of their owner's constitutionally protected interest in privacy. It was a search; there was no warrant; the owner had not consented; and there were no exigent circumstances.
>
> It is perfectly obvious that the agents' reason for viewing the films was to determine whether their owner was guilty of a federal offense. To be sure, the labels on the film boxes gave them probable cause to believe that the films were obscene and that their shipment in interstate commerce had offended the federal criminal code. But the labels were not sufficient to support a conviction and were not mentioned in the indictment. Further investigation—that is to say, a search of the contents of the films—was necessary in order to obtain the evidence which was to be used at trial.

The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents. Ever since 1878 when Mr. Justice Field's opinion for the Court in *Ex parte Jackson*, 96 U.S. 727, 24 L.Ed. 877, established that sealed packages in the mail cannot be opened without a warrant, it has been settled that an officer's authority to possess a package is distinct from his authority to examine its contents. (Citations and footnotes omitted).

In the instant case, on the contrary, Jabara's very words, summaries of which were supplied to the FBI, had been lawfully intercepted by and were in the records of the NSA. NSA therefore already had in its records, after it intercepted, all that it supplied to the FBI. Jabara appears to argue, however, that the fact that the NSA acquired, stored and retrieved a large amount of information using sophisticated, high-technology methods and equipment should lead to the conclusion that the NSA's acquisition of Jabara's telegraphic messages was not a search and that the only search occurred when, at the request of the FBI, the NSA retrieved Jabara's messages and delivered summaries to the FBI. There are two difficulties with this argument. First, the simple fact remains that the NSA lawfully acquired Jabara's messages, and these are all that it delivered to the FBI. Second, to the extent that Jabara relies on alleged facts surrounding the methods and technology of acquisition, storage and retrieval of information, such are, as was held by the district court, subject to the state secret privilege. It was recognition of the effect of the privilege that caused the district court to limit its consideration to the question whether the targeting of Jabara's communications by the FBI, in obtaining the summaries from the NSA, was a fourth amendment violation irrespective of the facts surrounding the acquisition, storage and retrieval of the information by the NSA.

Jabara, however, would have us apply still another analysis in support of his contention that his fourth amendment rights were violated when the FBI, without a warrant, requested and received summaries of his overseas messages. In this connection he relies on such cases as *United States v. Bailey*, 628 F.2d 938 (6th Cir. 1980). In *Bailey*, government undercover officers delivered a drum of a chemical, a precursor to the manufacture of a controlled substance, to defendant. The officers had installed a "beeper" inside the drum to aid in the surveillance and investigation of a suspected clandestine laboratory. The signal from the beeper was used by the officers to ascertain the location of the drum. The question raised was whether the placing of the beeper in the drum before it was delivered to defendant and the subsequent tracing of the drum by receipt of the signal from the beeper implicated the fourth amendment. In reaching the conclusion that the fourth amendment was implicated, our court, relying on *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), held that the question was whether defendant had a reasonable expectation of privacy with respect to the location of the drum. In this connection, our court stated (628 F.2d at 940):

We consider it irrelevant whether a particular governmental intrusion is classified as a "search" or as a "seizure." What matters is whether it violates an individual's legitimate expectation of privacy. Therefore, it is not necessary to speculate whether a beeper "searches" or "seizes" anything.

Our court then quoted (628 F.2d at 941) from Justice Harlan's concurring opinion in *Katz* to the effect that, while a reasonable expectation of privacy is the test, this means that the person asserting the claim must have exhibited an actual (subjective) expectation of privacy and that the expectation must be one that society is prepared to accept as reasonable.

Applying this analysis utilized by our court in *Bailey*, we agree that Jabara exhibited an actual (subjective) expectation of privacy when he sent the telegraphic messages overseas. But the question here is whether he had an expectation of privacy that society is prepared to recognize as rea-

sonable *after the messages had lawfully come into the possession of the NSA.* For it was *after* the messages were intercepted and within the possession of the NSA and only when they were delivered to the FBI that Jabara contends that his fourth amendment rights were violated. We do not believe that an expectation that information lawfully in the possession of a government agency will not be disseminated, without a warrant, to another government agency is an expectation that society is prepared to recognize as reasonable. In this connection, we believe that it is irrelevant that Jabara did not know that the NSA had intercepted his messages. To hold otherwise would in many instances require, for fourth amendment purposes, a succession of warrants as information, lawfully acquired, is passed from one agency to another.

We conclude, therefore, that Jabara's fourth amendment rights were not violated when the FBI obtained summaries of his overseas telegraphic communications from NSA and that the district court erred in granting summary judgment to Jabara and that, on the contrary, it should have granted summary judgment to defendants as to this claim.[9]

### III.

The district court also granted summary judgment to Jabara with respect to his claim that the FBI had violated a provision in the Privacy Act, 5 U.S.C. § 552a(e)(7), which provides that an agency shall:

> (7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or *unless pertinent to and within the scope of an authorized law enforcement activity.*

(Emphasis added).

In construing the emphasized words in this statute, the district court concluded (476 F.Supp. at 581):

Given this definition, it is difficult to conclude that the self-contained exemption in § 552a(e)(7) relating to law enforcement activity applies to any records which do not relate to specific past, present or future criminal acts.

The district court then determined, based upon the record before it, that the FBI's investigation that involved Jabara's first amendment activities did not relate to specific past, present or future criminal acts.

It thereupon entered an order providing that (App. at 197):

> Defendants and their successors in office are enjoined from recording, maintaining, using or disseminating information about the Plaintiff's political beliefs, communications, speeches, writings, associations or activities, both public or private, which do not relate to specific criminal acts.

Defendants then submitted the motion to reconsider the grant of summary judgment to Jabara on the claimed violation of the Privacy Act, which motion was supported by legislative history with respect to this statutory provision and by the aforementioned French open and *in camera* affidavits with respect to defendants' contention that, at least after November 1, 1971, the FBI had reasonable cause to believe that Jabara was a cadre member of a Middle East terrorist organization. The district court denied the motion to reconsider, stating that the defendants were tardy, without excuse, in supplying the legislative history and that, again, the facts set out in the French affidavits were known to the defendants prior to the grant of summary judgment.

Defendants contend that the legislative history demonstrates that the exemption in § 552a(e)(7) ("unless pertinent to and within the scope of an authorized law enforcement activity") allows investigation with

---

**9.** In note 5, *Halkin v. Helms,* 598 F.2d at 4 (D.C.Cir.1979), it is pointed out that, as a result of Exec. Order No. 12,036, 43 Fed.Reg. 3673 (1978), requests such as that made by the FBI here are screened by a Policy Review Committee of the National Security Council and must be validated as legitimate foreign intelligence needs.

respect to the exercise of first amendment rights if such investigation is relevant to an authorized criminal investigation or to an authorized intelligence or administrative one (Deft's. brief at 36).

Jabara reads the legislative history similarly and comes close to agreeing with defendants' construction of the exemption in the statute, stating:

> By its terms and legislative history the subsection does not bar the maintenance of records describing how a person exercises First Amendment rights if there is a direct nexus to an authorized criminal, civil or administrative law enforcement activity.

(Jabara's brief at 39–40).

■ We agree with both Jabara and the defendants that the district court's construction of the exemption in the statute, limiting it to investigation of past, present or future criminal activity, is too narrow. Moreover, if there is any difference of substance between Jabara's formulation and defendants' formulation of the effect of the exemption, we believe that the defendants' is, in the light of the legislative history, the more reasonable one.

It appears, then, that in granting summary judgment to Jabara on the Privacy Act claim, the district court applied too narrow a test in determining that the FBI's investigative conduct did not come within the statutory exemption. For this reason, we believe that the summary judgment should be vacated and the case remanded to the district court for application of a correct legal standard. In doing so, the district court, of course, is free to reconsider its prior decision not to consider and weigh the effect of the French *in camera* affidavit.

The judgments of the district court are therefore vacated and the case is remanded for further proceedings not inconsistent with this opinion.

MERRITT, Circuit Judge, dissenting from the order of the Court denying a rehearing en banc.

I believe that Jabara's Fourth Amendment rights were probably violated when the FBI, without a warrant, requested and received summaries of Jabara's overseas messages. I am of the opinion that the issue is of sufficient importance to require a hearing by the full Court.